# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **VELVET T. HERRON,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:09CV00056 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | United States District Judge |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*P. Heith Reynolds, Wolfe, Williams, Rutherford & Reynolds, Norton, Virginia, for Plaintiff; Stephen Ball, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Plaintiff Velvet T. Herron filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying her claims for disability insurance and supplemental security income benefits pursuant to Titles II and XVI of the Social Security Act respectively, 42 U.S.C.A. §§ 401-433, 1381-1383(d) (West 2003 & Supp. 2010). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g) and § 1383(c).

Herron filed for benefits in March 2005, alleging disability beginning July 6, 2001. Her claim was denied initially and upon reconsideration. In April 2007, Herron, represented by counsel, and a vocational expert appeared and testified before an administrative law judge ("ALJ") during a hearing. The ALJ denied Herron's claim. Herron sought review from the Social Security Administration's Appeals Council, which denied her request. Herron then filed a Complaint with this court.

The parties have filed cross motions for summary judgment and have briefed the issues. The case is ripe for decision.

II

Herron was 35 years old when she applied for benefits, a younger individual under the regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c) (2009). She had attended school through the twelfth grade, dropping out three weeks before graduation, and participated in special education classes during her schooling. She has worked as a fast food worker, a convenience store clerk, a house cleaner, a sewing machine operator, and a truck driver and flagger for a tree removal company. She has not engaged in gainful employment since 2001.

Herron claims disability due to chronic pain in her back, legs, knees, right shoulder, and left elbow; swelling in her legs and feet; depression; and limited

intellectual functioning. She provided medical and school records to the ALJ to substantiate her claim. Medical records included reports from November 1996 to March 2007, including emergency room and short-stay records from various hospital visits, and reports of consultative examinations by Jai Varandani, M.D., B. Wayne Lanthorn, Ph.D., Kevin Blackwell, D.O., and Edward E. Latham, Ph.D.

Elementary school records show that Herron repeated the fourth and ninth grades. Her last reported grade point average was a 1.66 and she achieved passing scores on standardized tests. Herron participated in special education while in school.

From May 2002 to June 2005, Herron regularly saw Marissa Vito Cruz, M.D., at Stone Mountain Health Services. Herron frequently complained to Dr. Vito Cruz of elbow, back, and neck pain, but Herron had a full range of motion for her neck, arms and legs. Upon request, Dr. Vito Cruz referred Herron to Kaye Weitzman, a licensed clinical social worker. Weitzman noted that Herron had a history of childhood sexual abuse, and suffered from abuse flashbacks. Weitzman diagnosed Herron with bipolar disorder, posttraumatic stress disorder ("PTSD"), generalized anxiety disorder, and mood disorder. A year later, in a subsequent assessment, Weitzman listed no limitations upon Herron's ability to work.

In 2005 and 2006, two state-agency physicians reviewed Herron's file and opined that Herron could lift or carry 25 pounds frequently, and could stand, walk,

or sit for six hours during an eight-hour workday. Two state-agency psychologists also reviewed Herron's file and concluded that she did not have any medically determinable mental impairment.

In 2003, Herron underwent a consultative examination by Dr. Lanthorn. The results placed her in the borderline range of intellectual functioning. Dr. Lanthorn opined that her combined psychological difficulties restricted her ability to function on a day-to-day basis, but Herron could manage money and her capacity for understanding was intact. Dr. Lanthorn performed a second evaluation of Herron in 2006. This examination placed her in the borderline range of current intellectual functioning also. Dr. Lanthorn indicated that Herron seemed capable of exercising appropriate self care and regularly performing a 40-hour work week.

That same year, Herron underwent a consultative psychological examination by Dr. Latham. Herron exhibited no evidence of pathologic disturbance in thought processes, content, or perception. The doctor noted that Herron's intellect was borderline deficient to low average, with a seventh grade reading equivalency. Dr. Latham concluded that Herron was able to understand, retain, and follow simple instructions, and her concentration skills were sufficient for simple, routine, repetitive tasks. Dr. Latham could not determine Herron's ability to relate interpersonally or

to handle everyday stressors because her answers to questions were inconsistent and lacked credibility.

In 2005 and 2006, Herron underwent two separate consultative exams with physicians. The doctors concluded that Herron suffered from some psychological ailments such as depression or chronic anxiety, but that physically she had a normal range of motion.

After reviewing the evidence, the ALJ found that Herron suffered from severe musculoskeletal impairments including fibromyalgia, and severe mental impairments including low intellectual functioning and mildly severe depression. The ALJ found due to her low intelligence and mildly severe depression Herron could only perform simple, unskilled, and medium-exertional activities. The ALJ concluded that Herron could work in her past jobs as a fast food worker, store clerk, or housekeeper.

III

The plaintiff bears the burden of proving that she suffers from a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A).

In assessing claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. § 404.1520(a)(4) (2009). If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases. *Id.*; *Bennett v. Sullivan*, 917 F.2d 157, 159 (4th Cir. 1990). The fourth and fifth steps of the inquiry require an assessment of the claimant's residual functional capacity, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *See Reichenbach v. Heckler*, 808 F.2d 309, 311 (4th Cir. 1985). The claimant does not have a disability if she can perform work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1566(b) (2009).

This court must uphold the ALJ's findings if substantial evidence supports them and they were reached through application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). This standard "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies. It is not the role of this court to substitute its judgment for that of the ALJ. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Herron asserts that the ALJ failed to consider whether she meets or medically equals the listings of impairments in 20 C.F.R. pt. 404, subpt. P, app. 1, section 12.05 (2009), which describes the guidelines for disabling mental retardation. A claimant is disabled if the individual has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," or prior to age 22. *Id.* Part C of Section 12.05 requires a "valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. § 404, Subpt. P, App. 1, § 12.05(C) (2009). To qualify as disabled, a claimant must satisfy both the diagnostic description and paragraph C.

Herron argues that her verbal I.Q. score of 70 found by Dr. Lanthorn in 2003, combined with her fibromyalgia and depression satisfy the criteria. But the record

does not demonstrate Herron lacked significant deficits in adaptive functioning that manifested before she was 22.

As for her IQ scores, Herron correctly argues that such scores are generally assumed to remain relatively constant absent evidence of some change, but this presumption is rebuttable. *See Luckey v. U.S. Dep't of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989). While it can be assumed that Herron's current verbal IQ of 70 was also her IQ prior to age 22, the score alone does not show a manifestation of deficits in adaptive functioning. Herron points to school records to support her claim. Throughout elementary school, teachers gave her satisfactory marks in almost all social growth areas. With some exceptions, her grades were mostly average. Thus, if anything, these records reasonably support a finding that deficits in adaptive functioning did not manifest prior to age 22.

Further support for normal adaptive functioning can be found elsewhere in the record. Herron's testimony indicates she can read and write and she takes care of animals. In his report, Dr. Lanthorn opined that Herron was alert and oriented, casually dressed, properly groomed, and ambulated without difficulty. Herron also completed all forms associated with her claim, on which she stated that she washes dishes, does laundry, cooks, pays bills, grooms herself, and does household chores.

Based upon this, substantial evidence exists to support the ALJ's finding that Herron is not disabled due to mental retardation.

Herron's second assertion is that the ALJ failed to properly evaluate the severity of her mental impairments by not discussing the functional limitations imposed by the impairments. In her assessment of Herron, no functional limitations were listed by Weitzman. And, due to her invalid personality profile and inconsistent responses, Dr. Latham could not rate whether Herron's abilities were limited. Based upon these opinions, the ALJ decided that Herron's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible." (R. at 23.) The ALJ also found there was no "substantial and objective evidence that Ms. Herron is subject to mental-health limitations." (*Id.*) Therefore, there was no valid evidence of functional limitations for the ALJ to discuss.

Herron also asserts that a finding of disability could have been made if Weitzman's opinion had been given proper weight, because Dr. Lanthorn's 2003 opinion supported Weitzman's findings.

When evaluating a claim, the ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983). With regard to evidence other than from a treating physician, the evidence is considered in terms of the length

of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability and consistency of the opinion, the specialization of the source, and any other factors that may support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(2)(i)-(ii), (d)(3)-(6) (2009). The ALJ is entitled to determine the weight of such opinions.

In reviewing Weitzman's findings, the ALJ noted that the assessment "can hardly be considered credible" because "[i]t is not supported by the record or any diagnostic testing." (R. at 22.) After a single consultation in March 2006, Weitzman diagnosed Herron with Bipolar I disorder, PTSD, generalized anxiety disorder, and mood disorder due to medical condition. A year later, Weitzman rated Herron's abilities to do work-related activities on a form, ranking all but three of the listed abilities as fair, which means that Herron's abilities were seriously limited but not precluded. Weitzman did not provide medical findings to support her rankings, nor did she include an explanation of her assessment.

Herron claims that this opinion is supported by Dr. Lanthorn's 2003 evaluation. Dr. Lanthorn diagnosed Herron with PTSD, borderline intellectual functioning, cannabis dependence, and major depressive disorder. He opined that "all of [Herron's] psychological difficulties make it quite difficult for her to function on a day-to-day basis." (R. at 509.) But his report also states that Herron can manage her

own money and that her "capacity for understanding seems relatively intact" despite some memory loss and concentration problems. (*Id.*)

Dr. Lanthorn completed the same assessment form as Weitzman, giving Herron a rating of poor in most categories. Included in these categories were abilities to deal with work activities such as relating to the public, relating to co-workers and supervisors, completing complex job instructions, and behaving in a socially stable manner. But Dr. Lanthorn's ratings conflict with his narrative report. Aside from being internally inconsistent, Dr. Lanthorn's 2003 opinion also conflicts with his 2006 examination of Heron. Based upon these inconsistencies, the ALJ was entitled to accord little weight to Dr. Lanthorn's analysis and Weitzman's opinion.

Finally, Herron argues that substantial evidence does not support the ALJ's determination that she can perform simple and unskilled jobs, which involve medium exertional activity.

Under the regulations, an assessment of physical limitations takes into account work demands such as "sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions," including "reaching, handling, stooping or crouching." 20 C.F.R. § 404.1545(b) (2009). Mental demands include "understanding, remembering, and carrying out instructions, and . . . responding appropriately to . . . pressures in a work setting." 20 C.F.R. § 404.1545(c) (2009).

The ALJ did not err by concluding that Herron could perform simple and unskilled jobs, which involve medium exertional activity. First, the ALJ referenced diagnostic tests that include X rays of Herron's spine, knees, left hip, and right shoulder. Of the more than 30 X rays, most returned normal results. Further evidence supporting the ALJ's conclusion is found in records from Drs. Blackwell and Varandani. The doctors opined that Herron's range of motion was normal and Dr. Blackwell concluded that Herron could sit and stand for eight hours of an eight-hour day, and could bend, stoop, squat, and kneel two-thirds of the day or less. The ALJ also considered Dr. Latham's opinion that Herron's attention and concentration were sufficient for completing simple, routine, repetitive tasks. Thus, this evidence supports the conclusion that Herron could perform simple, unskilled jobs.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: July 8, 2010

/s/ JAMES P. JONES
United States District Judge